## Gibson v. Madden.

(Decided March 1, 1929.)

274

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and plaintiff below, Benjamin Gibson, filed this equity action in the Knott circuit court against appellee and defendant below, John P. Madden, seeking to quiet plaintiff's title to about one-fourth of an acre of land near the confluence of the two forks of Irishman creek in Knott county and being a small strip lying between plaintiff's residence and the creek and upon which there is located a public road. Plaintiff asserted both a record and a prescriptive title to the controverted strip. Defendant denied either of such titles in plaintiff and asserted title in himself and by counterclaim sought to have it quieted. After the taking of extensive testimony, which was unlimited in its scope and without regard to relevancy, the court on final submission dismissed plaintiff's petition and quieted defendant's title to the contested land, and, complaining of that judgment, plaintiff prosecutes this appeal.

It appears from the record that at an early day in the history of that section of the state one George Madden and wife, Rachel Madden, ancestors of defendant and other Maddens who figure in this controversy, owned large contiguous tracts of land and that after their deaths, intestate, and on July 25, 1887, there was a division of all that land among the surviving children, grandchildren, and, perhaps, great-grandchildren of George Madden and wife. Before that division, and after the deaths of the ancestors George and Rachel Madden, defendant purchased the undivided interests of a number of the heirs, and in the division deeds made and executed on July 25, 1887, he was conveyed a tract containing about 1,000 acres, while Wesley Madden, another heir, was conveyed an adjoining tract, and it is a part of the latter tract (which part contains between 15 and 20 acres) that plaintiff, Benjamin Gibson, owns.

The settlement of the controversy as shown by the record title of plaintiff and defendant depends upon the construction of the description designating the division line between them as contained in the two division deeds. supra, the one to defendant, John P. Madden, and the other to Wesley Madden. The latter conveyed 200 acres of the portion allotted to him in the division to Charlie Madden and he conveyed the small tract now owned by plaintiff to Thomas Everage, who sold it to James Gibson, and he sold it to Sam Everage, who in turn sold it to plaintiff. In describing the above division line the division deed executed to Wesley Madden began at the beginning corner and ran certain courses and distances "to the mouth of the Bean Patch Hollow to two white oaks and a beech; thence up Irishman with the creek to a beech; thence up the left hand fork straight to a beech and haw trees; thence a straight line up the fork ridge to a beech and rock." The deed from Wesley Madden to Charlie Madden, when the description came to that division line, thus designated it: "Thence with said line (John P. Madden's line) to the mouth of the Bean Patch Hollow." And in the deed from Charlie Madden to Tom Everage the line was described as: "Thence south down the other point with the line between Charlie Madden and John P. Madden to the mouth of Bean Patch Hollow; thence with said line up the creek to the beginning." The contested land is bounded by the last call in that deed and plaintiff contends that the expression therein, "up the creek," carries his line to the center of the creek and with its meanders, and which, if true (and it must be so in order for plaintiff to establish his record title), it would depart from the other descriptions hereinbefore referred to contained in the deeds of prior vendors, wherein the line was a straight one from Bean Patch Hollow. If the line should be made straight from that point as it is designated in such prior deeds, then plaintiff failed to establish his record title. However, counsel is in error in his interpretation of the legal effect to be given the words "up the creek," as locating the line along the thread of its stream and with its meanders, as will be seen from a consultation of the cases of Varney v. Orinoco Mining Co., 201 Ky. 571, 257 S. W. 1016, and Carter v. Elk Coal Co., 173 Ky. 378, 191 S. W. 294, and other cases and authorities cited in those opinions.

In the division deed executed to defendant, hereinbefore referred to, the description runs around to: "Two haw trees near the forks of main Irishman; thence a straight line to the mouth of the Bean Patch Hollow." The haw trees mentioned in the various deeds to which we have referred are gone; but their location was established by numerous witnesses who positively identified the spot where they were located; and running the line as described in both the deeds of defendant, John P. Madden, and the one executed to Wesley Madden, locates the line, with the aid of the parol testimony designating the location of the haw trees, so as to prove the record title to the contested strip as being in defendant, John P. Madden, and not as belonging to the plaintiff, and the court correctly so found.

But it is strenuously contended by learned counsel for plaintiff that his client established a prescriptive title to the contested strip of land, which, as he contends, had its beginning in 1897, when Tom Everage conveyed the tract now owned by plaintiff to the latter's brother, James Gibson, who began the alleged adverse use of the land in contest by erecting some outbuildings upon it, and that both he and his immediate vendor occupied a portion of the strip as a part of their garden, and other portions for a woodpile in front of the dwelling, and another portion extending to the waters of the creek as a sort of rural laundry, where the weekly family laundering was done with the use of the water flowing in Irishman creek. We are not inclined to the opinion that the latter two uses could be characterized as adverse so as to eventually ripen into title, but it is not shown that even they were made for a continuous period of as much as 15 years so as to mature a prescriptive title. It is also undisputedly proven that, on a number of occasions throughout the entire time covered by such uses, defendant, in conversations with different interested persons, gave his permission therefor and in which they thereafter acquiesced, thereby establishing that such uses were permissive and not adverse. It is therefore clear that plaintiff failed to establish the prescriptive title relied on by him.

But it is seriously argued by the same learned counsel that the contested strip of land, though of but little intrinsic value, is of great value to his client as an appurtenant to his small tract, and without which he would be deprived of a site for his woodpile and also of a con-

venient place to do the family washing, and a most appealing argument is made to us to reverse the judgment and adjudge the contested strip as belonging to plaintiff so that he may not be deprived of such conveniences when it is of insignificant value to defendant. But the argument loses sight of the fact that our duty ends when we apply the law to the facts of the case, and we know of no principle of law that will permit courts to take the land of one person and give it to another merely for the latter's convenience. The argument also loses sight of the fact that plaintiff's women folks may still launder the family washing with the use of the waters of Irishman creek by walking a slightly longer distance, either up or down it, and where we presume the same amount, and the same suitable quality, of water may be found for the purpose, and, as for the woodpile site, plaintiff can appropriate a sufficient amount of space for that purpose from either his garden on one side of his residence or his orchard on the other side.

We have not so far discussed the testimony in this case concerning a forcible entry proceedings that seems to have been instituted by defendant against plaintiff before some justice of the peace, nor have we referred to other proceedings under our processioner's statute (sections 2367 to and including 2374 of Carroll's 1922 Edition of Kentucky Statutes), both of which seem to have been put into the case by testimony of witnesses without any sort of pleading relying upon them and which seems to have been done by defendant's counsel for good measure; but both of which are sought to be avoided by plaintiff's counsel on the ground that each of them was obtained by fraud and collusion and which is likewise based upon no pleading whatever. So that, if either of such proceedings could in any event affect the rights of the parties (a question not determined), the pleadings are in no condition to admit their introduction, and, for that reason, we dismiss their consideration without further comment.

We feel that we should not close this opinion without observing upon the searching character of many questions propounded to the witnesses by learned counsel for plaintiff, and the broad scope of the inquiries, whether relevant or not, made by him in such questions. As illustrations thereof, we insert some of the questions and some of the answers made by the witness. But preliminary thereto, and for an understanding of some of

the questions and answers, it should be stated that Thomas P. Madden was not an heir of George Madden, or his wife, and did not share in the division above referred to, nor was he a witness in this case. At the time that division was made and the deeds executed Thomas P. Madden was deputy county clerk for Knott county and he resided in the immediate neighborhood. He took the acknowledgments to all of the division deeds and carried them that night to his home, not far from the residence of defendant, for the purpose of writing the certificates thereto and later delivering them to the various vendees. Plaintiff's counsel, in an effort to explain away the described dividing line between plaintiff and defendant contained in the division deeds, argues that defendant went that night to the house of Thomas P. Madden and procured him to alter that line so as to make it read as it now appears in the deeds, and in substantiation of that argument he incorporated in an amended petition the statement that Thomas P. Madden was "a very crooked man." He attempted to prove that fact by his witness Adam Johnson, who was a blind man and had been so for more than 30 years, and the question propounded to that witness was: "Q. Mr. Johnson, do you know the cause of J. T. Madden the deputy county court clerk, above spoken of, why it was that he left this country and did you see him some time before he left, and was he dressed in women's clothes and if so for what purpose if you know, and while here and acting as deputy clerk about the 25th day of July, 1887, and about that time and before, was he not under the influence of the defendant, J. P. Madden, and was often with him and he now owning more property than the other Maddens?" The answer thereto was in this language: "Yes sir, he was master of Brinkley, Ky., Post Office and while he was Master of said Office he ordered through the mails a steam sawing griss mill from some company, but I do not know what company for certain, in the name of Peter Stink Finger, Billey Bung Whole and Orderly Sexton, all fictitious names. The steam mill was shipped to Prestonsburg or Whitehouse, I do not remember exactly where, the Post Master had recommended to the company the names that above stated to be honorable citizens and Brinkley was the Post Office Address, and they were solvent and honest bona-fide purchases shortly after expiration of the ten days after the order was made out the contract with the

purchasers, but after finding out that there names were fictitious then perhaps and before the said Madden were dressed in women clothes and soon thereafter sold his land to old uncle Wess Madden and left this country, I frequently saw the said J. T. Madden while he was deputy county court clerk, and about the time partition deeds were signed by the Madden's on the 25th of July, 1887, in company with the defendant John P. Madden and it appeared to me that they were special friends. Yes sir, he appeared to own more property than the other Madden's from the action of the said J. T. Madden, he seemed to want to associate with his people of the wealthier class of his people.''

Counsel also propounded this question: ''I will ask you if Mr. Gibson when he moved on the place he had a working and on that day he moved out his yard fence and his garden fence above the haws, and if some one let out fire, and the work hands just before noon quit and went to fight the fire, and if Charley Madden was at the working, and helped to move out the fence; please state all you know about the working when they moved the fence, just when James was fixing the stake and driving the stake between the haw bushes on which to nail his railings to the fence some one came running. I think it was Bud Madden's boy came running and said his father had let out the fire, and wanted all the help he could get to fight it, James and all the hands went to help put out the fire, and when James started his wife said what about your dinner, and James told her to bring it to us if they didn't come back in time. I don't think the hands came back but James did, and reported that there was about sixty panels of his fence burned up, Jameses wife went and took dinner to them. Do you know what made James Gibson set out his fence, or caused him to do it? Wess Madden come and ask her (Mrs. James Gibson) what made her stop her fence, she says he is claiming this, he says you can run your pailings on the left side of the haws trees. He says go on God-dam him he knows where the line is, he says you see that old hull, that creek is the line there and if he says anymore you come and tell me, I'll show him where the line is, he knows where the line is, and if he says anymore come and tell me, and I'll show him where the line is. He J. P. Madden says being as you are a woman, I'll say no more to you about it, he was speaking to Mrs. James Gibson, and do you know where

Jim Madden lived in his life time?'' The witness answered the question thus: ''Yes sir, he lived where John Madden now lives, and this was allotted to him in the divide made with other land lying in below it on both sides of the creek, John Madden when this divide was made lived on the Alum Cave Branch just above Dock Madden's on adjoining land to Dock's, I do not know when he moved down to Jim Madden's but he lived there when Jim Madden died. Jim Madden died just after my daughter Rosana married James Gibson. The reason that I know this is because James Gibson went to the sale of the old man Jim Madden's personal property, James Gibson was bidding for some pot vessels and my brother Will was bidding against him and I prevailed on my brother Will to quit bidding against him, that he was newly married and needed them.''

What we have inserted is but a fair sample of the way and manner the case was searchingly practiced and which characterization applies equally to the pleadings and also to the brief, and we have made mention of the fact in order to emphasize the further one that nothing was left undone by counsel to develop his client's case. His industry in that regard is to be commended.

However, for the reasons stated, the judgment must be, and it is, affirmed.

